# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

August 29, 2008



FILED by _____ D.C.

SEP 0 3 2008

STEVEN M. LARIMORE
CLERK U. S. DIST CT
S. D. of FLA MIAMI

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813

**Appeal Number: 07-11219-HH**
Case Style: USA v. Mynor Rolando Herrera Aguilar
District Court Number: 06-20226 CR-MGC

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: One psi
    Original record on appeal or review, consisting of: Eleven Volumes

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Will Miller (404) 335-6194

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 07-11219

District Court Docket No.
06-20226-CR-MGC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jul 31, 2008

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MYNOR ROLANDO HERRERA AGUILAR,
a.k.a. Mynor R. Herrrera-Aguilar,
GUILLERMO HERNAN SANCHEZ-SALAZAR,
a.k.a. Guillermo H. Sanchez-Salazar,

Defendants-Appellants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------

Appeals from the United States District Court
for the Southern District of Florida

--------------------------------------------------------------

# J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:       July 31, 2008
For the Court:  Thomas K. Kahn, Clerk
By:       Gilman, Nancy

ISSUED AS MANDATE
AUG 29 2008
U.S. COURT OF APPEALS
ATLANTA, GA.

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| JULY 31, 2008 |
| THOMAS K. KAHN |
| CLERK |

No. 07-11219
Non-Argument Calendar

D. C. Docket No. 06-20226-CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MYNOR ROLANDO HERRERA AGUILAR,
a.k.a. Mynor R. Herrrera-Aguilar,
GUILLERMO HERNAN SANCHEZ-SALAZAR,
a.k.a. Guillermo H. Sanchez-Salazar,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(July 31, 2008)**

Before BIRCH, DUBINA and HULL, Circuit Judges.

PER CURIAM:

Mynor Rolando Herrera Aguilar ("Aguilar") and Guillermo Hernan Sanchez-Salazar ("Sanchez-Salazar") appeal their convictions and sentences for conspiracy to possess with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to United States jurisdiction, in violation of 46 U.S.C. app. § 1903(a), (g), (j) and 21 U.S.C. § 960(b)(1)(B); and possession with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to United States jurisdiction, in violation of 46 U.S.C. app. § 1903(a), (g); 21 U.S.C. § 960(b)(1)(B) and 18 U.S.C. § 2.[1]  After review, we affirm.

## I. BACKGROUND

Aguilar and Sanchez-Salazar, along with five codefendants, were aboard a Panamanian-flagged vessel stopped by the United States Coast Guard on the high seas off the coast of Honduras.  After boarding, the Coast Guard discovered 104 bales of cocaine, totaling 2,442 kilograms, hidden in one of the vessel's ballast tanks.  Sanchez-Salazar was the vessel's first mate and Aguilar was a crew member and mechanic.  Following their arrest, Aguilar and Sanchez-Salazar pled not guilty.

---

[1]Defendants were indicted and convicted under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. app. § 1901-1904.  Six months after the defendants were indicted, Congress recodified the MDLEA, which can now be found at 46 U.S.C. §§ 70501-70507.  See Act of Oct. 6, 2006, Pub. L. No. 109-304, § 10(2), 120 Stat. 1485, 1685-89.  Therefore, we cite to the pre-amendment version of the MDLEA.

## A.    Pre-trial Motions

The defendants moved to dismiss the indictment for, among other things, lack of jurisdiction.  The district court denied the motion, concluding jurisdiction existed based on the Secretary of State's certificate, which indicated Panama had consented to the United States exercising jurisdiction over the vessel for purposes of criminal prosecution.  See 46 U.S.C. app. § 1903(c)(1) (providing that consent by a foreign nation to the enforcement of United States law by the United States is "conclusively proved " by such certification).  The district court also rejected Sanchez-Salazar's argument that the government needed to show a nexus between the United States and the charged conduct to establish jurisdiction.

Sanchez-Salazar also moved to suppress the evidence, including the cocaine, arguing the Coast Guard's stop was not supported by reasonable suspicion.  At an evidentiary hearing, Officer Michael Hennessy testified he became suspicious because the vessel was in an area known as a drug smuggling path and was riding unusually low in the stern and high in the bow.  He noticed rub marks on the port side, which, based on his training, indicated that a smaller boat might have rubbed alongside the vessel.  The vessel had a directional finder antenna, uncommon in merchant vessels, that determines the location of radio transmissions and suggested the vessel wanted to know the location of other boats in the area.

3

Officer Hennessy described his radio contact with the vessel's first mate, later identified as Sanchez-Salazar. The first mate initially was unable to answer routine questions about the vessel's next port of call and its cargo, which Officer Hennessy found unusual. When the first mate finally answered the questions, he was vague. For example, the first mate indicated the port of call was Belize, but when asked for specifics several more times answered Belize City. The first mate initially claimed the cargo was "[s]orted cargo," but did not know any specifics. Only after Officer Hennessy heard other voices in the background was the first mate able to identify the cargo specifically. To Officer Hennessy it sounded like the first mate was being coached on the answers by someone in the background. The district court denied the motion to suppress, finding, based on the totality of circumstances, that reasonable suspicion existed for the Coast Guard to stop and board the vessel.

**B.    Trial**

At trial, Officer Hennessy testified the Coast Guard came into contact with the vessel about sixty to eighty miles off the coast of Honduras in international waters and described the suspicious circumstances he observed and his radio contact with the first mate, defendant Sanchez-Salazar. Officer Hennessy obtained authorization from his chain of command to board and search the vessel.

4

Officer Theodore Tarini testified his boarding team found a tank that did not have a sounding tube (used to determine the amount of liquid in the tank) and was unsealed and undermaintained. Inside, Officer Tarini's team found several bales of cocaine, weighing fifty to seventy pounds each.

Victor Lituma, the vessel's chief engineer, testified that, before the vessel left Panama, Lituma instructed defendant Aguilar, a mechanic and welder, to make a hole in a tank to store the drugs, which Aguilar did. The drugs were delivered to the vessel on the high seas by a small boat, and the entire crew loaded the bales onto the vessel using a rope.

A forensic chemist testified the cocaine weighed 2,442 kilograms. A Federal Bureau of Investigation agent testified Sanchez-Salazar stated he was the first mate on the vessel and his duties included leveling the cargo and navigating the vessel.

The jury found Sanchez-Salazar and Aguilar guilty on both counts.

## C.   Post-trial Discovery Motion

Prior to sentencing, defendants filed a motion to compel evidence and for depositions. Defendants attached to the motion a Honduran newspaper article that reported: (1) the vessel was captured during an operation between Honduran and United States naval forces; (2) one week before the capture, Honduran naval

5

commander Captain Jose Adam Martinez Avila obtained information about a drug

shipment coming to Honduras by sea; (3) although Honduran naval commanders

initially stated the vessel was stopped in Honduran waters, Inspector Miguel

Martinez Madrid, a spokesman for the Honduran police, later stated the vessel was

stopped in international waters; and (4) the contraband was loaded in Colombia

(rather than on the high seas as codefendant Lituma testified).  Defendants

requested that "the government make inquiries of the Honduran and United States

agents involved in investigating this case" and turn over as <u>Brady</u>[2] material any

information suggesting the boat was loaded in Colombia or the vessel was in

Honduran waters when stopped by the Coast Guard.[3]  They also sought to depose

Inspector Madrid and Captain Avila.

At the sentencing hearing, the district court addressed defendants' motion to

compel.  Defense counsel argued the government had failed to produce a "consent

to board" document, which might indicate the location of the vessel when stopped

and whether the United States had jurisdiction over the vessel.  The prosecutor

---

[2]<u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963).

[3]Defendants argued that if the vessel had been stopped in Honduran waters, for the vessel to be "subject to the jurisdiction of the United States," the United States would have needed the consent of the Honduran, rather than the Panamanian, government.  See 46 U.S.C. app. § 1903(c)(1)(E) (including in the definition of the term "vessel subject to the jurisdiction of the United States" a "vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States").

responded the government had turned over all documents it had regarding the
location of the vessel. The prosecutor represented that, after the issue was raised in
the pre-trial motions, she had conducted an "extensive investigation," had "made
inquiries of the special agents in the case and the Coast Guard" and had found no
information or documents indicating the vessel was in Honduran waters.

The district court noted the evidence at trial showed the vessel was in
international waters and stated the newspaper article, which was hearsay, did not
rebut that evidence. The district court further stated the government did not have a
duty to investigate defendants' claims and there was no evidence that the
government had possession or control of exculpatory evidence. Consequently, the
district court denied the motion to compel.

## D.     Sentencing

Sanchez-Salazar's presentence investigation report ("PSI") recommended,
inter alia, a two-level increase in his offense level, pursuant to U.S.S.G. §
2D1.1(b)(2)(B), because he was the vessel's first mate. At sentencing, Sanchez-
Salazar argued the first mate enhancement applied only to defendants involved in
schemes to import controlled substances into the United States and the evidence
indicated the vessel was bound for Belize, not the United States. The district court
overruled the objection, finding Sanchez-Salazar's offense "was about importation

7

and the facts found at trial support that." Consistent with Sanchez-Salazar's PSI, the district court assigned him an offense level of 40 and a criminal history category of I, which gave him an advisory guidelines range of 292 to 365 months' imprisonment.

Aguilar's PSI assigned him an offense level of 38, with no enhancements or reductions, and a criminal history category of I, resulting in an advisory guidelines range of 235 to 293 months' imprisonment. Aguilar objected to the PSI, arguing, inter alia, that it improperly treated the guidelines as mandatory and failed to properly take into account the 18 U.S.C. § 3553(a) factors. The district court overruled Aguilar's PSI's objections and adopted the PSI's guidelines calculations.

The district court solicited argument on the § 3553(a) factors, and Aguilar's counsel urged the court to consider that (1) Aguilar was 38 years old; (2) he was a law abiding mariner his entire life; (3) he had a child and was amendable to rehabilitation; (4) there was no indication he would be a recidivist; and (5) the mandatory minimum ten-year sentence would be sufficient in light of the § 3553(a) factors. The government responded that a guidelines-range sentence was appropriate, stressing the offense involved over two tons of cocaine and Aguilar, as a welder, had helped to hide the cocaine in the vessel's tanks.

In arriving at defendants' sentences, the district court noted the amount of

8

drugs and number of people involved in the importation scheme, as follows:

> Now, in reviewing the factors in 3553(a) as to Mr. Sanchez Salazar, I do find that th[e] advisory guideline range as to him is not unreasonable. I believe it correctly analyzes the conduct here, and I just can't ignore there were seven people on this boat and there were tons of dope. Given that, I just can't ignore that in determining what went on here. This would have to be beyond mere presence, given the quantity of dope, the location of the boat and everything that went on here, for me to ignore that.
>
> The same goes for Mr. Herrera Aguilar. The 3553(a) factors I don't believe cause me to find this sentence as to him is unreasonable.

The district court sentenced Aguilar and Sanchez-Salazar to 235-month and 292-month concurrent prison terms on both counts, respectively. Aguilar and Sanchez-Salazar timely appealed.

## II. DISCUSSION

### A.    Motion to Dismiss the Indictment

The MDLEA prohibits drug trafficking by persons aboard a "vessel subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(a). A vessel subject to the jurisdiction of the United States includes "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." Id. § 1903(c)(1)(C).

On appeal, defendants argue the district court should have dismissed their indictment on jurisdictional grounds because there was no proof of a nexus

9

between the vessel or its crew and the United States.[4]  Defendants' argument is

foreclosed by <u>United States v. Rendon</u>, 354 F.3d 1320, 1324-25 (11th Cir. 2003),

in which this Court concluded the MDLEA does not contain such a nexus

requirement.  Accordingly, the district court did not err in denying defendants'

motions to dismiss.[5]

## B.    Sanchez-Salazar's Motion to Suppress

"Under the Fourth Amendment, the Coast Guard may stop and board a

foreign vessel in international waters if it has a reasonable suspicion that the vessel

is engaged in activity that violates United States law."  <u>United States v. Tinoco</u>,

304 F.3d 1088, 1116 (11th Cir. 2002).[6]  The district court looks at "the totality of

---

[4]We review a denial of a motion to dismiss an indictment for an abuse of discretion. <u>United States v. McPhee</u>, 336 F.3d 1269, 1271 (11th Cir. 2003). The district court's interpretation and application of statutory provisions relating to subject matter jurisdiction are reviewed <u>de novo</u> and its factual findings regarding jurisdiction are reviewed for clear error.  <u>Id.</u>

[5]<u>Rendon</u> also forecloses defendants' arguments that the MDLEA violates their Fifth and Sixth Amendment rights by empowering the district court to determine subject matter jurisdiction as a preliminary matter and that prosecution under the MDLEA violates the Due Process Clause.  <u>See</u> 354 F.3d  at 1325-27.  We also find meritless Aguilar's arguments that, because his offense occurred outside the United States's territorial or customs waters: (1) the district court lacked personal jurisdiction over him; (2) his prosecution violated 21 U.S.C. § 960, the MDLEA's penalty provision; and (3) his prosecution violated the Sixth Amendment's venue provision. Furthermore, Aguilar's argument that Congress exceeded its power under the Commerce Clause in enacting the MDLEA is unavailing given that Congress enacted the MDLEA under its authority in the Piracies and Felonies Clause.  <u>See United States v. Estupinan</u>, 453 F.3d 1336, 1338-39 (11th Cir. 2006), <u>cert. denied</u>, 127 S. Ct. 1486 (2007).

[6]The government argues that the Fourth Amendment does not apply to the interdiction and search of a vessel not registered in the United States that is found in international waters and is crewed by foreign nationals.  The government cites <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 110 S. Ct. 1056 (1990), in which the Supreme Court concluded the Fourth Amendment

the circumstances" to determine whether a reasonable suspicion existed. Id. (quotation marks omitted). "Though there must be an objective basis for suspecting wrongdoing, officers subjectively may assess the facts in light of their unique training, expertise, and experience in the field." Id. Furthermore, reasonable suspicion may be found based on "the cumulative information of which the detaining officer is aware . . . even if each fact, viewed in isolation, can be given an innocent explanation." Id.[7]

Here, the following facts provided the Coast Guard with a reasonable suspicion the vessel was engaged in drug smuggling: (1) the vessel was found in an area known as a drug smuggling path; (2) the vessel was riding high in the bow and low in the stern; (3) there were rub marks on the side of the vessel consistent with another boat coming alongside the vessel; (4) the vessel had a directional

---

did not apply to the search of a Mexican citizen's residence in Mexico by United States agents. 494 U.S. at 274-75, 110 S. Ct. at 1066; see also United States v. Bravo, 489 F.3d 1, 8-9 (1st Cir.), cert. denied, 128 S. Ct. 344 (2007) (concluding, based on Verdugo-Urquidez, that the Fourth Amendment does not apply to the search of a foreign vessel with alien crew in international waters). After Verdugo-Urquidez, however, this Court in Tinoco, 304 F.3d at 1116, analyzed and upheld a vessel search in international waters under the Fourth Amendment. We recognize Tinoco did not cite Verdugo-Urquidez and no argument was made that the Fourth Amendment did not apply. However, because there was reasonable suspicion here, we need not analyze whether our prior panel precedent rule forecloses us from doing anything other than following Tinoco.

[7]Review of a district court's denial of a motion to suppress presents a mixed question of law and fact. United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). The district court's factual findings are reviewed for clear error, construing the evidence in the light most favorable to the prevailing party, and the district court's interpretation and application of the law is reviewed de novo. Id.

11

finder antenna, uncommon on merchant vessels, which suggested the crew wanted to monitor the location of other vessels in the area; and (5) Sanchez-Salazar, the first mate who communicated with the Coast Guard by radio, initially had difficulty responding to questions regarding the vessel's cargo and next port of call, ultimately gave vague answers and appeared to be coached by someone in the background, even though this was information the first mate should readily have known. Even if each circumstance, taken individually, might be susceptible of an innocent explanation, as Sanchez-Salazar maintains, taken together they are sufficient to support a reasonable suspicion of drug smuggling activity.

## C.    Post-trial Motion to Compel Evidence and for Depositions

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the government must disclose, upon a defendant's request, documents that are "within the government's possession, custody, or control," that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). However, there is no Rule 16 violation if the requested documents are not in the government's (that is, the prosecutor's) possession, custody or control. See United States v. Brazel, 102 F.3d 1120, 1150 (11th Cir. 1997).

Similarly, the Due Process Clause requires a prosecutor, upon the defendant's request, to provide evidence in the government's possession favorable

to him if such evidence is material to his guilt or punishment. <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). However, there is no general constitutional right to discovery in criminal proceedings, and "the <u>Brady</u> rule is not an evidentiary rule that grants broad discovery powers to a defendant." <u>United States v. Quinn</u>, 123 F.3d 1415, 1421 (11th Cir. 1997). "The rule regarding exculpatory evidence announced in <u>Brady</u> applies after trial when it is discovered that the prosecution had material information of which the defense was unaware." <u>United States v. Arias-Izquierdo</u>, 449 F.3d 1168, 1189 (11th Cir. 2006). However, the district court may decline to order discovery "based upon mere speculation as to whether the material would contain exculpatory evidence because to do so would convert <u>Brady</u> into a discovery device and impose an undue burden upon the district court." <u>Id.</u> (quotation marks omitted).[8]

Here, the district court did not abuse its discretion in denying defendants' motion to compel discovery or order depositions; nor did it err in concluding that there was no <u>Brady</u> violation. Defendants failed to point to any documents or other evidence in the government's possession, custody or control that were withheld from them, much less that such evidence would have been favorable to them.

---

[8]We review a district court's denial of a defendant's post-trial motion for discovery for an abuse of discretion. <u>See</u> <u>United States v. Espinosa-Hernandez</u>, 918 F.2d 911, 913 (11th Cir. 1990). We review <u>de novo</u> a district court's conclusion that a <u>Brady</u> violation did not occur. <u>United States v. Mejia</u>, 82 F.3d 1032, 1036 (11th Cir. 1996).

Although there was some initial confusion about whether a "consent to board" document might exist, separate and apart from the Secretary of State's certification, the prosecutor represented that she conducted an extensive investigation and determined no such document existed. Indeed, the prosecutor represented that she found no documents indicating that the vessel was in Honduran waters, that the vessel was loaded in Colombia rather than on the high seas or that the Coast Guard was cooperating with the Honduran Navy when it stopped the vessel.

The Honduran newspaper article was not possessed or suppressed by the government. Nor is it clear from the article that it would have led to admissible evidence or that any such evidence would have been favorable to defendants. Under the circumstances, defendants were merely speculating about the possibility of exculpatory evidence. Accordingly, the district court did not commit reversible error in denying defendants' motion to compel discovery.[9]

## D.  Sanchez-Salazar's U.S.S.G. § 2D1.1(b)(2)(B) Enhancement

Section 2D1.1 of the Sentencing Guidelines increases a defendant's offense

---

[9]Defendants' request to conduct depositions of two Honduran officials was properly denied because it came after trial and was for discovery purposes. See Fed. R. Crim. P. 15(a) (permitting a party to move to depose a prospective witness "to preserve testimony for trial"); Simon v. United States, 644 F.2d 490, 498 n.12 (5th Cir. May 1981) (explaining that, in criminal proceedings, depositions may be taken only in exceptional circumstances upon order of the court and the only authorized purpose of a such depositions is to preserve evidence for trial, not to afford discovery).

level by two levels if he "unlawfully imported or exported a controlled substance under circumstances in which . . . the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance." U.S.S.G. § 2D1.1(b)(2).[10] The district court imposed the two-level enhancement because Sanchez-Salazar was the vessel's first mate.

On appeal, Sanchez-Salazar does not challenge the district court's finding that his first mate position qualified him for the enhancement. Instead, Sanchez-Salazar argues the enhancement applies only to offenses involving the importation of drugs into, or exportation of drugs from, the United States.

The plain language of § 2D1.1(b)(2) does not limit the enhancement to the importation of controlled substances into the United States. See U.S.S.G. § 2D1.1(b)(2). Instead, the enhancement applies when a defendant's offense is importation in violation of the laws of the United States. Furthermore, this Court has already held that actual importation does not need to occur in order for § 2D1.1(b)(2) to apply and that the enhancement applies to attempts and conspiracies to import drugs. Rendon, 354 F.3d at 1329-30.

_____

[10]In evaluating a district court's imposition of an offense level enhancement, "[w]e review a district court's findings of fact for clear error and its application of the Sentencing Guidelines de novo." Rendon, 354 F.3d at 1329.

In Sanchez-Salazar's case, the evidence demonstrated he was the first mate on a vessel carrying over two tons of cocaine and Sanchez-Salazar conspired with other crew members to import that cocaine.  Under <u>Rendon</u>, this evidence was sufficient to support the two-level enhancement.

## E.    Reasonableness of Aguilar's Sentence

Aguilar argues his 235-month sentence was unreasonable because it is too harsh under the circumstances and because the district court failed to consider: (1) Aguilar's age and lack of criminal history; (2) the unlikelihood that Aguilar would re-offend; and (3) the adequacy of a ten-year sentence to deter others.

After <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005), we review sentences for reasonableness, which is synonymous with the abuse of discretion standard, in light of the § 3553(a) factors.  <u>Gall v. United States</u>, 552 U.S. ___, 128 S. Ct. 586, 597 (2007); <u>see also</u> <u>United States v. Williams</u>, 526 F.3d 1312, 1321-22 (11th Cir. 2008).[11]  The party challenging the sentence bears the burden of proving that it is unreasonable.  <u>Williams</u>, 526 F.3d at 1322.

---

[11]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to afford adequate deterrence, to promote respect for the law, to provide just punishment for the offense, to protect the public, and to provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the sentencing guidelines range; (5) pertinent Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  <u>See</u> 18 U.S.C. § 3553(a).

"The district court must impose a sentence that is both procedurally and substantively reasonable." Id. at 1321-22. A sentence "may be procedurally unreasonable if the district court improperly calculates the guideline range, treats the guidelines as mandatory, fails to consider the appropriate statutory factors, bases the sentence on clearly erroneous facts, or fails to adequately explain its reasoning." Id. at 1322. If the district court made no procedural errors, then the substantive reasonableness of the sentence is reviewed to determine whether the § 3553(a) factors support the sentence. Gall, 552 U.S. at ___, 128 S. Ct. at 597. "In determining whether a sentence is substantively reasonable, this Court must consider the totality of the circumstances." Williams, 526 F.3d at 1322.

"[I]n imposing a reasonable sentence, the district court need only acknowledge that it considered the § 3553(a) factors . . . and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." United States v. Brown, 526 F.3d 691, 713 (11th Cir. 2008) (quotation marks and emphasis omitted); see also United States v. Ellisor, 522 F.3d 1255, 1278 (11th Cir. 2008) ("[A] court's explicit acknowledgment that it has considered a defendant's arguments and the § 3553(a) factors is sufficient to demonstrate that it has adequately and properly considered those factors."). A district court's failure to discuss mitigating evidence highlighted by defense counsel during the

17

sentencing hearing does not mean the district court erroneously ignored or failed to consider this evidence. <u>Brown</u>, 526 F.3d at 713.

Nothing in the record suggests the district court failed to consider the § 3553(a) factors. Rather, after hearing Aguilar's mitigation argument, the district court concluded the § 3553(a) factors did not render a sentence within the advisory guidelines range unreasonable. The district court heard Aguilar's arguments at sentencing regarding his age, lack of criminal history, low risk of recidivism, and the sufficiency of a ten-year sentence to rehabilitate him and provide deterrence. The fact that the district court did not explicitly discuss these arguments does not mean the district court failed to consider them. <u>See Brown</u>, 526 F.3d at 713. Aguilar has not shown that his sentence is procedurally unreasonable.

As to substantive reasonableness, the district court explicitly noted the very large amount of drugs involved in the importation scheme and the fact that, given the location of the vessel and the number of crew members, the defendants' roles were "beyond mere presence." Indeed, the record reflects that Aguilar not only helped load the cocaine on the vessel, he cut the hole in the tank so that the cocaine could be hidden inside. Under the totality of the circumstances, we cannot say the district court erred in weighing the § 3553(a) factors. Thus, Aguilar failed to carry his burden to show his 235-month sentence, at the low end of the advisory

18

guidelines range, was substantively unreasonable.

## III. CONCLUSION

For all the forgoing reasons, we affirm the convictions and sentences of Sanchez-Salazar and Aguilar.

**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By _____
Deputy Clerk
Atlanta, Georgia

19